# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **BETTY J. BROWN, Personal Representative for the Estate of Robert D. Brown, Deceased,** ] ] ] ] | |
| **Plaintiff,** ] ] | |
| **v.** ] ] | Case No.: 2:04-cv-0999-VEH |
| **FIRST DATABANK, INC.** ] ] | |
| **Defendant.** ] | |

## MEMORANDUM OPINION

I.    Introduction.

Currently before the Court are two motions in limine filed by the defendant, First Databank, Inc., to exclude the testimony of Plaintiff's two experts, Pamela Sims, M.D., and Peter Breggin, M.D., and a motion for summary judgment filed by First Databank on April 20, 2005. (docs. 57, 67, & 71.)  The plaintiff, Betty J. Brown, has filed suit against First Databank for negligence and wantonness.  First Databank has moved for summary judgment on both Plaintiff's claims.  (doc. 57.)  Upon full consideration, Defendant's motions in limine, as well as its motion for summary judgment are due to be **GRANTED**.  Further, having reviewed Defendant's Motion

to Strike Evidence in Opposition to Motion for Summary Judgment (doc. 74) and Plaintiff's Motion to Strike Evidence Offered in Defendant's Brief to Exclude the Opinion Testimony of Peter Breggin M.D. (doc. 83) and finding that neither motion alters or affects the summary judgment determination, the Court finds that these motions should be **TERMED** as **MOOT**.

II.     Facts.[1]

This action arises from the suicide death of Robert D. Brown on August 28, 2002, nine months after he began taking Reglan, or metoclopramide, a prescription medication used to treat gastroesphogeal reflux disease (GERD). Brown's widow, on behalf of Brown's estate, filed the instant suit on May 14, 2004, seeking to recover under theories of negligence and wantonness. (doc. 1.) She alleges that Reglan causes depression and specifically that Reglan caused or contributed to her husband's depression and subsequent suicide in August, 2002. Plaintiff contends that First Databank proximately caused her husband's death by failing to place an adequate warning on Reglan's label. An adequate warning, Brown contends, would have

---

[1] The facts set out below are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party for the purposes of deciding the defendant's motion for summary judgment. *See Info. Sys. & Networks Corp., v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

caused Mr. Brown's physician to prescribe a different course of treatment or would have alerted the deceased of the risk of depression and suicide associated with Reglan's use.

In support of her theory of causation, Brown has presented the testimony of two experts, Pamela Sims, Ph.D., and Peter Breggin, M.D., who have testified that it is generally accepted that metoclopramide causes depression and suicide and that Reglan in fact caused Mr. Brown's depression and subsequent suicide.

III.   Motions in Limine.

   A.   *Daubert* Analysis.

While Federal Rules of Evidence 401 and 402 provide for the liberal admission of relevant evidence, Rules 403, 702, and 703 mitigate against this general policy by giving trial courts the discretion to exclude expert testimony that is either unreliable or irrelevant. *See Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999). The Eleventh Circuit has held that scientific expert testimony is admissible when: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact

in issue. *See, e.g., Toole v. BaxterHealthcare Corp.*, 233 F.3d 1307, 1312 (11th Cir. 2000); *Allison*, 184 F.3d at 1309; *City of Tuscaloosa v. Harcross Chem., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).

In *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), the Supreme Court imposed a special duty upon trial judges pursuant to Rule702, requiring the judge to act as a "gate-keeper" and ensure that scientific evidence is both reliable and relevant before it is admitted. *Id.* The Supreme Court has recognized that judges are not trained scientists and that the task imposed by *Daubert* is difficult in light of their comparative lack of expertise. *General Electric Co. v. Joiner*, 522 U.S. 136, 148 (1997). Nevertheless, the judge's relatively inexpert attention is considered preferable to dumping a "barrage of questionable scientific evidence on a jury." *Allison*, 184 F.3d at 1310. When the expert evidence is complex and voluminous, a trial court has inherent authority to use neutral outside experts of its own choosing to help with the *Daubert* undertaking. *Id.* at 1310-11. While this Court is aware of its duty as a gatekeeper, it understands that its role is not intended to supplant the adversary system or the role of the jury, and it recognizes that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citing *Daubert*, 509 U.S. at 596).

The *Daubert* Court set out four nonexclusive factors which should be considered by a trial court assessing the reliability of expert scientific testimony under Rule 702: (1) whether the theory or technique is capable of being tested; (2) whether the theory or technique has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has gained general acceptance within the scientific community. *Daubert*, 509 U.S. at 595. Other factors which have been considered in conducting a *Daubert* analysis include reliance on anecdotal evidence (as in case reports), temporal proximity, and extrapolation (as in animal studies). *Allison*, 184 F.3d at 1312.

A *Daubert* inquiry focuses on the principles and methodology underlying expert opinion testimony, not on the conclusions they generate. *Allison*, 184 F.3d at 1312 (*citing Daubert*, 509 U. S. at 595). However, testimony based solely on the experience of the expert is not admissible. *Rider v. Sandoz Pharmaceuticals Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002) (*citing Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999)). The court must be sure that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* Accordingly, the proponent of the testimony does not have the burden of proving that the testimony is scientifically correct, but that it is reliable. *Allison*, 184 F.3d at 1312. However, the conclusions reached and the

methodology used to reach them are not "entirely distinct from one another." *Joiner*, 522 U.S. at 146. Often, experts will extrapolate from already existing data. *Id*. "But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id*. This scientifically valid connection between the opinion and the facts also has been called "analytical fit." *Rider*, 295 F.3d at 1197.

The plaintiff has presented the testimony of two experts and the Court has received sufficient information and explanation from both parties to allow it to determine whether the testimony is admissible under *Daubert* framework.

B.   Pamela Sims, Ph.D.[2]

Brown has presented the testimony of Pamela Sims for the purposes of establishing that Reglan can cause depression. (doc. 62.) First Databank has argued that Dr. Sims's testimony should be excluded because she did not follow reliable methodology in reaching her conclusion. (doc. 68.)

---

[2] Dr. Sims holds a Clinical Doctorate and Ph.D. in Pharmaceutical Sciences, and is Professor and Chair of the Department of Pharmaceutical Sciences at the McWhorter School of Pharmacy at Sanford University, where her teaching responsibilities include therapeutic drug management - the examination of the appropriate use of medication in patients taking into consideration their physiology, their age, sex, diseases, and the presence of other medications. (doc. 61, Exhibit 20.)

In determining the effect of metoclopramide, Dr. Sims applied her background, training and experience in clinical pharmacy, pharmaceutical sciences and pharmacology and "review[ed] the pharmacology of the medications that Mr. Brown was prescribed and determine[d] if any of those medications could cause depression." *Id*. She states her findings and conclusions as follows:

> **IV. Pharmacology of Metoclopramide**
> Metoclopramide was prescibed for Mr. Brown to treat gastroespohageal disease (GERD). Mr. Brown was first prescribed metoclopramide on November 27, 2001, and took that drug until August 26, 2002. During the period of metoclopramide use, Mr. Brown developed severe depression, Parkinsonism and other extrapyramidal symptoms. Those conditions are known side effects of metoclopramide and demonstrate an intolerance to the drug. In addition, the elderly are known to be more sensitive to the effects and the side effects of metoclopramide. Therefore, careful monitoring and dosage adjustments are important when prescribing metoclopramide for an elderly patient. Beginning in the early 1980s case reports were published indicating the potential for metoclopramide to cause psychiatric disorders and akathisias. Since that time, many reports, reviews, and studies have been published which evaluate these occurrences to determine if they are drug induced diseases. The literature indicates that metoclopramide does cause depression, increases the risk of suicide, and can induce a Parkinson-like syndrome, can cause extrapyramidal effects and induce tardive dyskinesia.
> Those effects appear to be attributable primarily to the dopaminergic blockade caused by metoclopramide and are intensified by its cholinergic effects. Parkinsonism and extrapyramidal effects result from the deficiency of dopamine and are intensified by the imbalance of dopamine and acetylcholine. Theories of the etiology of depression include decreases in catecholamines (from a variety of reasons) and imbalances in adrenergic and cholinergic function. Therefore the drug-induced depression may also be caused or

>
> exacerbated by other abnormalities of catecholamines which occur during metoclopramide therapy.  Furthermore, depression is a neurobehavioral abnormality which is part of parkinsonism.  The metaclopramide-induced depression and other psychiatric disorders have been reported with shorter high doses and more chronically administered low doses which indicate that the neurotransmitter abnormalities and the drug's adverse effects are dose and duration of therapy related.
>
> ***
>
> **VI. Summary**
>
> Based on my background, training, experience, review of case materials and relevant literature my opinions in this matter are that:
>
> (1) Mr. Brown was prescribed metoclopramide for the treatment of his GERD and during the course of therapy he developed depression which worsened in severity.  Eventually Mr. Brown developed other extrapyramidal side effects of metoclopramide which demonstrate his intolerance to the drug.  Metoclopramide is contraindicated in patients with a known intolerance to the drug.
>
> (2) Metoclopramide is known to cause depression accompanied by suicidal ideation and suicide.

(doc. 61, Exhibit 20.)

First Databank attacks the reliability of Dr. Sims's opinion on grounds that it lacks the indicia of reliability necessary to survive a *Daubert* inquiry because, *inter alia*, it completely ignores key principles of toxicology, including the dose-response relationship.  In defending Sims's methodology, Plaintiff argues that "Dr. Sims testified very specifically as to how pharmacologists make determinations of causation in cases of drug-induced disease." (doc. 86 at 9-10)  Specifically, "Dr. Sims explained that where the known pharmacology of a drug (*i.e.*, the mechanism by which it works) demonstrates that it can produce a certain side effect, and the

temporal relationship between the taking of the drug and the adverse event supports that theory, then the drug probably caused the event." *Id*.

As in any *Daubert* inquiry, the Court must begin by examining the methodology Dr. Sims employed to reach her conclusions. Brown need not prove that Dr. Sims's conclusions are scientifically correct, but she does have the burden of proving that Dr. Sims's testimony and methodology are reliable. See, e.g., *Allison,* 184 F.3d at 1312. Dr. Sims testified that "the way that drug induced disease is determined, is you will get a temporal relationship in the pharmacology of the drug and the rest of the picture and that's how you determine whether the drug is responsible for that particular disease." (doc. 57, Exhibit. W at 123.) Based on the pharmacology of metoclopramide (*i.e.*, the mechanism by which it works), as stated above, Dr. Sims opined that metoclopramide can cause depression, either directly through the depletion of dopamine or indirectly as a "neurobehavioral abnormality which is part of parkinsonism," another side effect of metoclopramide use. (doc. 86 at 20.) To fill in "the rest of the picture" Dr. Sims relied on case reports, indicating the potential for metoclopramide to cause psychiatric disorders and akathisia and other literature, including reports, reviews, and studies, which suggest that metoclopramide does cause depression, increases the risk of suicide, can induce a Parkinson-like syndrome, can cause extrapyramidal effects and induce tardive

dyskinesia. "Therefore, metoclopramide's pharmacology, particularly its . . . effect on the central nervous system, the significant number of case reports of depression (and other serious psychiatric symptoms) related to use of metoclopramide, and the consensus in the reference sources that there is a strong association between metoclopramide use and depression, cause[d] Dr. Sims to conclude that metoclopramide can cause depression and suicide." (doc. 86 at 11.)

While Dr. Sims's opinions may be based on the standard and accepted approach to identifying adverse drug events among pharmacologists, in the wake of *McClain v. Metabolife International, Inc.*, 401 F.3d 1233 (11th Cir. 2005), Sims's opinions lack the indicia of reliability necessary to survive a *Daubert* inquiry because they neglect several factors that a court is instructed consider in reviewing expert testimony regarding causation.  Indeed, in *McClain*, the Eleventh Circuit equipped the Court with a checklist of "key principles of toxicology" that should be considered in any attempt to establish whether a chemical exposure was causally related to a specific adverse effect." *Id*. at 1242.  These principles are: (1) a demonstrated link between exposure to the chemical or drug and the type of injuries the plaintiff alleges; (2) sufficient exposure to the chemical or drug to cause the medical problems; (3) the chronological relationship between exposure and effect; and (4) evidence of an increased incidence of the injury over the background risk.  "Foremost among these

principles is the dose-response relationship." *Id*.

As the Eleventh Circuit stated in *McClain*,

> When analyzing an expert's methodology in toxic tort cases, the court should pay careful attention to the expert's testimony about the dose-response relationship. The dose-response relationship is "[a] relationship in which a change in amount, intensity, or duration of exposure to an agent is associated with a change-either an increase or decrease-in risk of disease." The expert who avoids or neglects this principle of toxic torts without justification casts suspicion on the reliability of [her] methodology.

*Id*. at 1241-1242.

Here, Dr. Sims states that "metoclopramide's adverse effects are dose and duration of therapy driven." (doc. 61, Exhibit. 20 at 4-5) ("The metoclopramide-induced depression and other psychiatric disorders have been reported with shorter high doses and more chronically administered low doses which indicate that the neurotransmitter abnormalities and the drug's adverse effects are dose and duration of therapy related.). She also acknowledges that the "elderly are known to be more sensitive to the effects and the side effects of metoclopramide," (doc. 61, Exhibit 20 at 4). She does not, however, offer any testimony about the general dose-response levels for metoclopramide's toxicity, i.e. the doses at which it causes harm or, in this case, the doses at which it causes depression, nor does she offer anything specific regarding how metoclopramide affects elderly individuals. Simply put, "[she does]

not say how much is too much." *McClain*, 401 F.3d at 1241.

"In toxic tort cases, [s]cientific knowledge of the harmful level of exposure to a chemical plus knowledge that plaintiff was exposed to such quantities are minimal facts necessary to sustain the plaintiff's burden. . . ." *Id*. at 1241 (quoting *Allen v. Pennsylvania Eng'g Corp*., 102 F.3d 194, 199 (5th Cir. 1996) (internal quotations omitted). Although other individuals could possibly testify as to how much Reglan the plaintiff took, a reliable groundwork for determining the dose-response relationship is necessary to determine the dose at which exposure would cause any adverse effect.

Dr. Sims's opinions also fail to consider "the likelihood that the [drug] caused the disease or illness . . . in the context of other known causes." *Id.* at 1243. More specifically stated, Dr. Sims's opinion fails to take into account the background risk of depression or the risk that everyone faces of suffering depression without having ingested Reglan."

Here, in evaluating the reliability of Dr. Sims's testimony, "it would help to know how much additional risk for [depression] or [suicide Reglan users] have over the risks the general population faces. If [metoclopramide does] not increase the incidence of [depression] and [suicide] in persons who ingest it, as opposed to all those who do not and still [experience depression and suicidal ideation], that fact

would reduce the likelihood that [Reglan] harmed [the plaintiff]." *McClain*, 401 F.3d at 1234. Sims, however, offers no testimony of such an additional risk.

For the foregoing reasons, despite the fact that there is evidence of the first and third criteria - a demonstrated link between exposure to Reglan and depression and a chronological relationship between exposure and effect - and even though Dr. Sims is qualified to testify competently regarding the matters in this case, the Court is of the opinion that Dr. Sims's methodology was not sufficiently reliable under the *Daubert* analysis, and her testimony would not assist the trier of fact to understand the evidence or determine a fact in issue. In addition to omitting the second and fourth criteria, Dr. Sims's opinion often refers to severe depression, Parkinsonism and other extrapyramidal symptoms as the "known side effects of metoclopramide," thereby presupposing that which she is trying to prove. The mere fact that the methodology Dr. Sims employed is "the way in which drug induced disease is determined," is of no consequence. "In the *Daubert* context, such phrases have little value." *McClain*, 401 F.3d 1244. Therefore, First Databank's motion in limine to exclude the testimony of Dr. Sims is due to be **GRANTED**.

C. Peter Breggin, M.D.

Plaintiff Brown has offered the testimony of Dr. Breggin in an effort to show

that "[Reglan] caused Mr. Brown's diagnosed parkinsonism, depression, and suicidality, thereby causing his death by suicide." (doc. 62.) Without Sims's foundational testimony that Reglan can cause depression, however, the testimony of Dr. Breggin regarding the connection between Mr. Brown's treatment with Reglan and his suicide is irrelevant.[3] Thus, having concluded that defendant's motion to exclude Dr. Sims's testimony should be granted, the Court is of the opinion that Dr. Breggin's testimony should also be excluded.[4]

In addition to requiring an inquiry into reliability, *Daubert* also requires a special inquiry into relevance, calling on the court to ensure that the expert testimony logically advances a material aspect of the proposing party's case. *Allison*, 184 F.3d at 1312 (citing *Daubert*, 509 U.S. at 591). More aptly stated, for an expert's testimony to be admissible, there must be a valid scientific connection between the testimony and the disputed facts in the case.

Here, "necessarily antecedent to testimony from [Dr. Breggin] that [Reglan]

---

[3] Dr. Breggin also opines that "Reglan can cause depression, suicidality, Parkinsonism and tardive dyskinesia." Like Dr. Sims, however, in drawing this conclusion, Dr. Breggin relies almost exclusively on the mechanism of action (*i.e.*, the way the drug works), thus resigning his general causation opinion to the same fate as Dr. Sims's.

[4] Even though the defendant does not seem to be impressed by his credentials, Dr. Breggin appears to have experience in medication adverse effects, both as a psychiatrist and as an expert in preparation for litigation. The Court's exclusion of Dr. Breggin's testimony is therefore based solely on the relevance grounds. Thus, to the extent that defendant's motion seeks to exclude Dr. Breggin's testimony on the ground that Dr. Breggin is a "renegade" psychiatrist, Defendant's motion is DENIED.

caused [the deceased's] injuries is evidence that [Reglan can cause the alleged injuries] in the first place." *Rink*, 400 F.3d at 1995 (citing *Oken v. Monsanto Co.,* 371 F.3d 1312, 1314 (11th Cir. 2004) (per curiam) (noting that proving causation requires proof of a breach or a defect and then proof that the specific breach or defect "alleged" caused the injury)). Dr. Breggin's testimony that Reglan caused Mr. Brown's depression is therefore contingent upon Dr. Sims's testimony that Reglan is capable of causing depression, which the Court has found to be unreliable. Because there is no reliable expert evidence that Reglan in fact causes depression, the testimony of Dr. Breggin is irrelevant and thus is also properly excluded. *Rink v. Cheminova*, 400 F.3d 1286, 1295 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589 and *Allison*, 184 F.3d at 1320) (affirming exclusion of expert on relevance grounds)).

IV.  Summary Judgment.

First Databank, in addition to filing the two motions in limine discussed above, filed a motion for summary judgment (doc. 57) on each of Plaintiff's claims for relief As grounds for its motion, First Databank argues, *inter alia*, that Brown has failed to present sufficiently reliable evidence on the issue of causation. Because the Court is of the opinion that First Databank's motions in limine regarding Dr. Sims's testimony and Dr. Breggin's testimony are due to be granted, the Court finds that First Databank's motion for summary judgment should also be **GRANTED**.

A.     Summary Judgment Standard of Review.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the nonmoving party must respond with

positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. *Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

    B.    Causation.

Causation is an essential element for each one of Brown's theories of recovery. In order to prove a claim for negligence, she must establish that the defendant

breached a duty owed to the plaintiff and that the breach proximately *caused* injury to the plaintiff. *Wal-Mart Stores, Inc. v. Rolin*, 813 So. 2d 861, 863 (Ala. 2001). A claim for recovery under the theory of wantonness requires a showing that the defendant was aware that its conduct would probably *result* in injury to another or in damage to another's property. *Weatherly v. Hunter*, 510 So. 2d 151, 152 (Ala. 1987).

To survive First Databank's Motion for Summary Judgment, Brown must produce evidence that would allow a reasonable jury to find to a reasonable degree of medical certainty that Reglan is capable of causing depression and that Reglan did in fact cause Mr. Brown's depression. *McClain*, 401 F.3d at 1237 ("To prove their toxic tort claims, Plaintiffs must prove the toxicity of the ephedrine/caffeine combination and that it had a toxic effect on them causing the injuries that they suffered.") "This type of proof requires expert testimony." *Id*. In the absence of such expert medical testimony, no genuine issue of material fact exists, and the Court must grant summary judgment. Therefore, because the Court has found that the testimony of Brown's experts, Dr. Sims and Dr. Breggin, is inadmissible, Brown cannot establish that Reglan was the cause of Mr. Brown's depression and suicide. Absent proof that Reglan caused the deceased's suicide, Brown cannot prove that First Databank's failure to provide an adequate warning proximately caused Mr. Brown's death.

There being no genuine issues of material fact exists with respect to causation, First Databank's motion for summary judgment is due to be **GRANTED**.

V.  Conclusion

For the reasons stated above, the Court holds that the opinions of Dr. Sims and Dr. Breggin are inadmissible and the motions in limine (docs. 67 & 71) to exclude their testimony are due to be **GRANTED**.  Further, Defendant's motion for summary judgment (doc. 57) is due to be **GRANTED**.  The remaining pending motions (docs. 74 & 83) are **TERMED** as **MOOT**.

**DONE** this 20th day of September, 2006.

/s/ VEHopkins
_____
**VIRGINIA EMERSON HOPKINS**
United States District Judge